986 F.2d 1110
 38 Cont.Cas.Fed. (CCH) P 76,482, 38 Fed. R.
Evid. Serv. 173
UNITED STATES of America, for the Use and Benefit of TREAT
BROTHERS COMPANY, an Illinois Corporation,
Plaintiff-Appellee,
v.
FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland
Corporation and Blinderman Construction Company,
Incorporated, an Illinois Corporation,
Defendants-Appellants.
 No. 91-2651.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 28, 1992.
Decided Feb. 23, 1993.
Rehearing and Rehearing En Banc Denied
March 30, 1993.
 
 Ted H. Crewell, argued, Beckett & Crewell, Champaign, IL, for plaintiff-appellee.
 John F. Martin, Dukes, Martin, Helm & Ryan, Danville, IL, Scott F. Turow, argued, Sonnenschein, Nath & Rosenthal, Chicago, IL, for defendants-appellants.
 Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 RIPPLE, Circuit Judge.
 
 
 1
 Defendant-appellant, Blinderman Construction Company and its surety, Fidelity and Deposit Company of Maryland, appeal from a verdict in favor of Treat Brothers Company on a breach of contract claim arising out of a government contract for construction of a personnel dormitory at Chanute Air Force Base in Rantoul, Illinois. Federal jurisdiction was based on the Miller Act, 40 U.S.C. § 270b (1988), and on 28 U.S.C. § 1331 (1988). Treat's claim was tried to the bench; the federal district court determined that Blinderman had breached its contract with Treat and thus owed Treat $99,654.68. Moreover, the court held that Blinderman had litigated the claim in bad faith; therefore, the court assessed attorneys' fees and prejudgment interest against Blinderman. In total, Treat was entitled to $138,279.57 from Blinderman. Blinderman now appeals the judgment and the award of fees and interest. For the reasons that follow, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Blinderman Construction Company (Blinderman) was the general contractor on a dormitory construction project at Chanute Air Force Base. Treat Brothers Company (Treat) was one of numerous subcontractors on the project. Blinderman and Treat had worked together on two earlier construction projects and testimony in the record indicates that their prior working relationship had been relatively contentious. On the Chanute project, Treat was responsible for providing drywall and ceiling work, plastering, insulating, and similar interior specialty construction. The original contract price for Treat's work was $507,500. Early in the construction process, a dispute arose between Blinderman and Treat over whether Treat was responsible for fireproofing work necessary in the dining hall and bakery areas of the building. Blinderman believed that fireproofing was included in the terms of Treat's original contract, while Treat contended that it was not part of the work it had contracted to provide. Pursuant to terms in the contract, Treat fireproofed the areas while the matter was submitted to an arbitrator. The arbitrator determined that Treat was required to perform fireproofing as part of its contract. The arbitrator also awarded Treat $21,500 for brown coating and lathing. The district court noted that the payment was not connected to the disputed fireproofing and neither party disputes this point.
 
 
 4
 Additionally, during the course of the construction job, Treat agreed to provide Blinderman with additional work that was not included in the original contract. One of these additions, "Change Order AD," provided for additional room finishing and ceiling treatment. Treat and Blinderman could not agree on the value of the work performed under Change Order AD and, because of this dispute, Blinderman never paid Treat for these services.
 
 
 5
 Relations between Treat and Blinderman continued to deteriorate, and eventually Treat walked off the construction site. The record indicates that Blinderman had paid Treat on the majority of its contract and that Treat had completed almost all of its work on the project at the time that it abandoned the job. However, Blinderman did incur certain costs, known as "back charges," in completing the work that Treat had left unfinished. Blinderman's cost of completion was also disputed by the parties.
 
 B. District Court Proceedings
 
 6
 Pursuant to the Miller Act, Treat brought suit in the United States District Court for the Central District of Illinois. It sought money that it contended Blinderman owed on the construction contract. Treat focused its claim on three main issues. First, Treat claimed that it was entitled to additional costs incurred by Blinderman's alleged failure to tender the bakery and dining hall premises to Treat in suitable condition for fireproofing. Second, Treat claimed that it was due approximately $17,000 for the room finishing and ceiling work that it had agreed to perform pursuant to Change Order AD. Blinderman, however, contended that the value of the services required in Change Order AD was approximately $4,800. Finally, Blinderman and Treat disputed the value of the back charges that Blinderman incurred in completing the project. Treat alleged that the reasonable value of the back charges was approximately $4,000; Blinderman contended that the true cost was approximately $45,000. Blinderman also counterclaimed for $21,500, contending that if the district court did not find the fireproofing issues barred by res judicata, then Treat should not have been awarded this amount in the arbitration proceedings for brown coating and lathing.
 
 
 7
 At trial, Blinderman moved to dismiss Treat's claim relating to the condition of the premises for fireproofing on the ground that further litigation of this issue was barred by the doctrine of res judicata because of the prior arbitration proceeding. The court denied this motion. It held that the arbitrator's award dealt only with the question of whether fireproofing was within Treat's original contractual obligations, and that the claim Treat made for extra labor and materials to perform the fireproofing work due to the condition of the worksite was a separate issue not precluded by the arbitration award. The district court stated that the award did not "purport to rule on any claim for breach of the contract in preparation of the working space to receive the cementitious fireproofing material." Mem. Op. at 4.
 
 
 8
 As part of its case in chief, Treat presented the testimony of Major Thomas Ayers and Mr. James Johnson, of the Army Corps of Engineers, who had been involved with the day-to-day state of the Chanute dormitory construction project. Although neither Major Ayers nor Mr. Johnson had been listed as an expert in the pretrial order, or in Treat's discovery responses, the court nonetheless allowed them to give opinion testimony relating to, among other things, the condition of the worksite, the value of the work Treat left unfinished, and the accuracy of Blinderman's value estimates. Blinderman objected to this testimony, claiming, alternatively, that it should be barred because neither Major Ayers nor Mr. Johnson had been disclosed as experts before trial, and because Army regulations prohibited the two men from rendering this testimony. The district court rejected these arguments and allowed both men to testify. In its findings of fact rendered after the trial, the district court specifically relied on the testimony of these two witnesses when it determined the value of the work performed by both parties.
 
 
 9
 During trial, Treat also tendered a motion to assess attorneys' fees and prejudgment interest against Blinderman, based on Blinderman's alleged bad faith and vexatious conduct throughout the litigation. At the conclusion of trial, the court, finding evidence of bad faith, granted this motion. Specifically, the court found that Blinderman was using its claim for back charges in an attempt to recover monies from Treat for losses Blinderman itself incurred because of its own inadequate performance and poor workmanship under the construction contract. The court also found that Blinderman's counterclaim for a $21,500 "reverse change order" from Treat was a "disingenuous" attempt to recover the $21,500 Treat was awarded in the arbitration for its brown coat and lath work. Mem. Op. at 10.
 
 
 10
 As relief, the court found that Blinderman owed Treat $99,654.68 plus an additional $17,063.95 in prejudgment interest, yielding $116,718.63 in total damages. In calculating the damage award, the district court found that Treat was entitled to $27,135 for the extra expenses incurred due to Blinderman's failure to provide the premises in a suitable condition for fireproofing and to $17,342 as the reasonable value of work Treat performed pursuant to Change Order AD. The court did find, however, that Treat was responsible for $4,424 in back charges claimed by Blinderman. Finally, the court required Blinderman to pay Treat $21,560.94 for attorneys' fees. Blinderman appeals from the district court's judgment and order for fees and prejudgment interest.
 
 II
 ANALYSIS
 
 11
 Blinderman raises five issues in this appeal. First, it contends that the district court erred by not barring as res judicata Treat's claim regarding the site condition of the fireproofed area. Second, Blinderman contends that the court's award of approximately $17,000 to Treat for its work on Change Order AD was clearly erroneous. Third, Blinderman raises a two-pronged attack on the district court's decision to allow Major Ayers and Mr. Johnson to render opinion testimony, claiming that their testimony should have been barred both by Treat's failure to designate them as expert witnesses prior to the commencement of trial and by Army regulations. Fourth, Blinderman argues that, under the Supreme Court's recent decision in Chambers v. NASCO, Inc., --- U.S. ----, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the district court abused its discretion when it awarded attorneys' fees based on Blinderman's bad faith conduct. Finally, Blinderman argues that the award of prejudgment interest was clearly in error because Illinois state law allows such interest only on claims that are liquidated or otherwise subject to exact computation. We shall address each of these issues in turn.
 
 A. Res Judicata
 
 12
 Blinderman raises two separate arguments as to why the fireproofing issue should now be considered res judicata. First, it argues that, under our decision in Rudell v. Comprehensive Accounting Corp., 802 F.2d 926 (7th Cir.1986), cert. denied, 480 U.S. 907, 107 S.Ct. 1351, 94 L.Ed.2d 521 (1987), Treat was required to present the issue to the arbitrator and its failure to do so should have exempted this claim from litigation in the trial court. Alternatively, Blinderman contends that the fireproofing issue was actually raised by Treat at the arbitration and was resolved with finality in that forum, thus precluding relitigation.
 
 1.
 
 13
 "[I]n most instances a defendant's failure to raise a defense or a counterclaim in a prior action will not bar him from raising a related claim in a subsequent proceeding ..." Henry v. Farmer City State Bank, 808 F.2d 1228, 1232 (7th Cir.1986). As we recognized in Rudell, however, a subsequent counterclaim will be barred by res judicata if its litigation would nullify the prior judgment or would impair rights established in the preceding action. 802 F.2d at 928. When a defendant has failed to interpose a counterclaim, he may not bring a subsequent action on that claim if "successful prosecution of the second action would nullify the initial judgment or would impair the rights established in the initial action." Restatement (Second) of Judgments § 22(2)(b). Thus, in Rudell, we held that, after the plaintiffs had their liability under a franchise agreement determined in an arbitration proceeding, they were barred from subsequently bringing a lawsuit claiming that the entire franchise agreement was fraudulent. 802 F.2d at 929-30. This court reasoned that:
 
 
 14
 Allowing the Rudells to challenge the validity of the franchise agreement now would clearly serve to undercut the arbitration award which was confirmed by the district court.... [T]he Rudells are seeking to set aside the franchise agreement, although recognizing that, at the same time, their duties and obligations under that agreement would presumably continue to be enforced pursuant to the arbitration award. Such a position is untenable since it advocates relitigation of a claim, i.e., the validity of the franchise agreement, which has already been resolved.
 
 
 15
 Id. at 930. Likewise, in Henry, 808 F.2d at 1235-36, a suit claiming that a mortgage was procured by fraud was barred from litigation because a state court foreclosure proceeding on the mortgage had already been held.
 
 
 16
 Therefore, under the teachings of Rudell and related cases, a later claim will be barred if successful prosecution would abrogate the prior judgment or impair rights established in the initial action. This situation does not appear to be at issue here. The issue in dispute as set forth in the demand for arbitration was "whether the parties intended that fireproofing was part of the subcontract agreement." Defs.' Ex. 21. Subsequently, the arbitration award held that Treat was required to fireproof areas of the dormitory as part of its original contract with Blinderman.[1] In the present suit, Treat claims that Blinderman breached the construction agreement by failing to tender the site in an appropriate condition. Although Treat could have presented this breach of contract claim to the arbitrator had Treat so desired, the prosecution of this second claim before the district court neither nullifies the initial judgment of the arbitrators nor impairs rights established in that proceeding. Nor has Blinderman established that the contract required that both claims be brought to the arbitrator at the same time.[2] Unlike the plaintiffs in Rudell, Treat does not dispute the existence and validity of the underlying contract. The point of Treat's present claim is not that there was no valid contract between it and Blinderman, nor that it was not responsible under the contract for fireproofing, nor that Blinderman had not properly reimbursed it for the lathing and brown coat work. Instead, Treat has brought a separate claim alleging that Blinderman did not live up to its end of the bargain to provide workable site conditions. The arbitration award states nothing about this claim. Although this contention is related to the arbitrated issue, it is not the same claim nor does it invalidate rights previously established in the prior proceedings. The claim does not undercut the finding that Treat was required to perform fireproofing under the terms of its subcontract. We agree with the district court's conclusion that the arbitration award established only that fireproofing was included in Treat's original contract and that Blinderman was responsible for paying Treat $21,500.00 for lathing and brown coat work. Treat's claim here does nothing to jeopardize these findings or the enforceability of the contract itself. Treat is merely contending that it lived up to its promises under the agreement, while Blinderman did not. Because this second claim does not nullify the initial arbitration award or impair rights established in the arbitration, res judicata does not bar Treat's fireproofing claim. Thus, pursuant to Rudell, the district court appropriately heard Treat's claim.
 
 2.
 
 17
 In the alternative, Blinderman claims that the physical state of the fireproofing site was actually put in issue at the arbitration proceeding. If so, then relitigation of the claim in the district court should have been barred as res judicata. Res judicata, however, is an affirmative defense, Blonder-Tongue Lab., Inc. v. University of Ill. Found., 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971), which Blinderman had the burden of proving at trial. La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V., 914 F.2d 900, 906 (7th Cir.1990); 18 Charles A. Wright et al., Federal Practice and Procedure § 4405 (1981) (stating that "the burden of establishing preclusion is placed on the party claiming it"). There is some evidence in the record that Treat warned it might present the site condition claim to the arbitrator. See Letter from Treat's Attorney to Blinderman, Defs.' Ex. 19. However, there is no evidence that the issue actually was raised at the arbitration.[3] The record evidence noted by Blinderman may demonstrate that Treat had the opportunity to present the claim at arbitration; it does not prove that Treat did so. Blinderman can point to nothing stronger than conjecture that Treat actually arbitrated this issue. Thus, Blinderman has not overcome its burden to establish that the fireproofing issue should have been precluded from the case presented to the district court for resolution. The district court did not err when it declined to bar the issue on the ground of res judicata.
 
 
 18
 B. Value of Work Performed Under Change Order AD
 
 
 19
 Blinderman next contends that the district court erred in awarding Treat $17,342 for the additional ceiling and drywall work it performed pursuant to Blinderman's instructions in Change Order AD.[4] Blinderman contends that this finding was clearly excessive and flatly contradicted by Treat's own records. Instead, it argues, the district court should have awarded Treat an amount somewhere between $4,838, the amount at which Blinderman valued the work performed, and $7,499, the price quoted by Treat in both a bid submitted in February 1986 and a payment request made in August 1986. The district court rejected Blinderman's argument after hearing testimony from both parties' witnesses. The court stated that it was persuaded by the testimony of Harvey Treat, Treat's vice-president and secretary-treasurer, that the true value of the change order was $17,342. The district court specifically found that Mr. Treat's testimony was credible while the testimony of the Blinderman witnesses was not. The court found that Blinderman's witnesses were not credible on this issue because their testimony regarding the value of the change items was not based on on-site first-hand observations and day-to-day participation in the construction project.
 
 
 20
 On appeal, we review the district court's assessment of damages only to determine whether the judgment is clearly erroneous. Stanley Gudyka Sales Co. v. Lacy Forest Prods. Co., 915 F.2d 273, 277 (7th Cir.1990); Hagge v. Bauer, 827 F.2d 101 (7th Cir.1987). The district court erred, Blinderman argues, when it accepted the testimony of Mr. Treat as to the reasonable value of Change Order AD. Essentially, Blinderman claims that the court erred when it found Mr. Treat credible in the face of countervailing testimony and the dollar values that he stated on his own business documents. However, "[i]t is well settled that credibility determinations are the sole province of the trial court, to which this court owes special deference on appeal." Cartwright v. American Sav. & Loan Ass'n, 880 F.2d 912, 920 (7th Cir.1989); see also Gilardi v. Schroeder, 833 F.2d 1226, 1228 (7th Cir.1987) (stating that credibility determinations "are for the district court to make and will be overturned on appeal only if there are extraordinary circumstances"). From our independent review of the record, we cannot say that the court abused its discretion in finding Mr. Treat's testimony credible.[5]
 
 
 21
 C. Opinion Testimony by Major Thomas Ayers and Mr. James Johnson
 
 
 22
 Blinderman next brings a dual attack on the district court's decision to allow Major Thomas Ayers and Mr. James Johnson, both of the Army Corps of Engineers, to render testimony on the quality of the work performed and the value of the services that Treat rendered to Blinderman. The district court relied on this testimony in determining that Blinderman had breached its contract with Treat when it tendered the fireproofing site to Treat in nonworkable condition and in assessing the value of Treat's work in respect to back charges that Blinderman assessed for the work that Treat left uncompleted when it walked off the job.
 
 
 23
 Treat called Major Ayers and Mr. Johnson to testify because they were involved on-site with the construction project and were very familiar with both Blinderman and Treat's completed work. Neither man was hired as an expert witness for Treat. Treat listed both men as occurrence witnesses in answer to Blinderman's interrogatories and in the pre-trial order; neither was separately identified before trial as an expert witness. Blinderman claims that the district court erred in allowing both Major Ayers and Mr. Johnson to testify.
 
 1.
 
 24
 Although Major Ayers was never disclosed as an expert witness, Blinderman claims that he did in fact give expert testimony on Treat's behalf. Major Ayers testified on a wide range of matters including the quality of the work that Treat had performed and the value of the work that it had left undone. Blinderman objected when it was proffered at trial, claiming that the court could not hear this testimony because it involved matters upon which expert knowledge was needed and Major Ayers had never been disclosed as an expert witness as required in the pre-trial order. The court overruled Blinderman's objections, noting that Major Treat was an eyewitness to both the dispute and the construction project as a whole. Tr. at 128. Thus, he was directly and personally involved in the project at issue. The court further found that Major Ayers was qualified to give opinion testimony under either Federal Rule of Evidence 701[6] or 702.[7]
 
 
 25
 "The decision whether to admit evidence is a matter 'peculiarly within the competence of the trial court and will not be reversed absent a clear abuse of discretion.' " Simplex, Inc. v. Diversified Energy Sys., Inc., 847 F.2d 1290, 1292 (7th Cir.1988) (quoting Soderbeck v. Burnett County, 821 F.2d 446, 453 (7th Cir.1987)). Thus, we give great deference to a trial court's decisions regarding proffers of testimony. We believe that the district court did not abuse its discretion when it allowed Major Ayers to testify regarding matters on which he had personal knowledge based upon his own work with the construction at Chanute. The opinions that he gave regarding the quality of the completed work and its value were acquired through his contact with the project. Thus, it was unnecessary for Major Ayers to be denominated as an expert witness in order for the court to accept his opinion testimony.[8] Major Ayers may indeed be an expert on construction; in this matter, however, we think that the record supports a reading that he was giving his opinion as to what he observed and knew about the work at the Chanute base. We conclude, therefore, that the district court did not abuse its discretion by declining to exclude Major Ayers' testimony.
 
 2.
 
 26
 Blinderman next contends that the district court erred in not excluding the testimony of Mr. Johnson and Major Ayers because their appearance as witnesses violated Army regulations. In particular, Blinderman claims that neither gentleman had obtained written permission from the Department of the Army to give opinion testimony at trial, and therefore violated 32 C.F.R. § 516.42(a) (1992). In this case, it is important to note that the Army is not attempting to enforce the regulation in order to prevent its personnel from testifying in private litigation. Instead, we are presented with a rather unusual situation in which a private litigant, Blinderman, is attempting to enforce Army regulations in litigation in which the Army is not a party and has no interest.
 
 
 27
 Under the regulations, if Department of Army personnel are requested as witnesses in private litigation, their involvement in the litigation is solely a personal matter between the witness and the requesting party unless the testimony sought involves information acquired in the performance of official duties or because of the official status of the witness, or unless the witness is to testify as an expert. 32 C.F.R. § 516.40(a)(1) & (2). If the testimonial information sought was derived from the performance of official duties, then the witness must refer the matter to the Staff Judge Advocate, the legal advisor serving the organization of the individual whose testimony is requested, or the Headquarters, Department of the Army (HQDA), as appropriate. 32 C.F.R. § 516.41(a). That official must then decide whether to authorize the release of such information. 32 C.F.R. §§ 516.37, 516.34(a) & (b). The regulations further state that "official information should generally be made reasonably available for use in Federal and State courts and by other governmental bodies unless the information is classified, privileged, or otherwise protected from public disclosure." 32 C.F.R. § 516.37(a). Furthermore, under the expert witness regulation, Department of the Army personnel or employees cannot provide opinion or expert testimony concerning official information, subjects, or activities in private litigation without prior approval of HQDA. 32 C.F.R. § 516.42. HQDA may grant special written authorization for the testimony if the requester makes a showing of exceptional need or unique circumstances and shows that the testimony will not be adverse to the interests of the United States, the Department of the Army, and the Department of Defense. Id.
 
 
 28
 Blinderman claims that both Major Ayers and Mr. Johnson testified in violation of the Army regulations. At trial, Blinderman objected to their testimony stating that they had not received special written permission from Army Headquarters to give opinion or expert testimony as required under § 516.42. Both men stated that they had received oral permission to testify, but Blinderman claims this was insufficient to satisfy the regulations. The district court overruled these objections, noting that neither man was hired as an expert. Moreover, the court also appeared to agree with plaintiff's argument that the regulations establish policy between the Department of the Army and its personnel, not between a private party and Army employees. Tr. at 129. Thus, if any violation of the regulations occurred, this would be a matter between the two witnesses and the Army, not between Blinderman and Treat.
 
 
 29
 Before we can determine if Major Ayers' and Mr. Johnson's testimony violated the Army regulations and were erroneously admitted at trial, we must first decide if Blinderman, as a private party, may assert the alleged violation of Army regulations in order to preclude the testimony of Major Ayers and Mr. Johnson. Blinderman argues that the regulations are meant to benefit private litigants by guaranteeing that, except for exceptional cases, the Army and its personnel must maintain strict impartiality by refusing to give opinion testimony. By intervening in a dispute through offering testimony, Blinderman argues, the Army acts as the arbitrator in a private dispute, a result the regulations are meant to prohibit.
 
 
 30
 While it is true that the regulation recites that the Department of the Army "maintains strict impartiality in private litigation" and states that "conflicts of interest are to be avoided," 32 C.F.R. § 516.42 (expert witness regulations), thereby requiring special permission before Army personnel can testify as expert witnesses, we do not believe that the regulation, when read as a whole, can be interpreted to protect Blinderman's interest. Even the expert witness section is more plausibly read to support the inference that the Army is attempting to avoid any seeming bias or other conflict in its relations with private parties that might impair the service's national defense duties or otherwise reflect poorly on the Army. Indeed, this entire section of the Code of Federal Regulations is designed to provide the Army with a single, centralized method of dealing with litigation, both public and private, in which the military service might be asked to play a role. The Department of the Army has stated that the regulations are meant to prescribe "policy and procedures for the representation of the Department of the Army and its personnel in civilian court proceedings," as well as the "prosecution of offenses committed on military installations; and the release of information and appearance of witnesses in criminal and civil court actions." 55 Fed.Reg. 10350-01 (1990) (codified at 32 C.F.R. § 516.1 et seq.). None of these goals is intended to benefit private litigants.
 
 
 31
 Blinderman presents us with no other evidence that private enforcement of the regulations was intended by their enactment. Thus, regardless of whether Major Ayers and Mr. Johnson received permission to testify in strict accordance with the letter of the Army regulations, we believe that Blinderman does not have standing to claim a violation based upon the provisions at issue.
 
 D. Award of Attorneys' Fees
 
 32
 We review for abuse of discretion a district court's imposition of attorneys' fees pursuant to its inherent power to sanction. Chambers, --- U.S. at ----, 111 S.Ct. at 2138; Gieringer v. Silverman, 731 F.2d 1272, 1281 (7th Cir.1984).
 
 
 33
 The usual Miller Act case revolves around a plain and simple commercial dispute. F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 130, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). As the district court explicitly acknowledged, attorneys' fees are ordinarily not recoverable in the absence of a statute or contract provision stating otherwise. Any other result would abrogate the long-held American Rule, through which each party shoulders the cost of litigating its own case. Id. at 130-31, 94 S.Ct. at 2165-66. There are, however, exceptions to this rule. It has been well-settled, as a general proposition, that it is within the discretion of the trial court to award attorneys' fees to a successful litigant when "his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons...." Id. at 129, 94 S.Ct. at 2165; see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (stating that courts have the power to assess attorneys' fees when the losing party has acted in bad faith), as when fraud has been practiced upon the court, or when a party acts in bad faith by delaying or disrupting the litigation or by hampering the enforcement of a court order. Chambers v. NASCO, --- U.S. ----, ----, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991). In NASCO, the Supreme Court has recently confirmed this exception to the American Rule and the district courts' inherent power to sanction abusive and egregious behavior by a litigant by awarding attorneys' fees. This exception to the general American Rule is applicable in Miller Act cases. See F.D. Rich Co., 417 U.S. at 129-30, 94 S.Ct. at 2165.
 
 
 34
 NASCO emphasizes that the imposition of sanctions, including attorneys' fees, on the basis of the court's inherent power is to be undertaken with great circumspection. While a court has the authority to preserve the integrity and, indeed the viability, of the judicial process, it does not have the prerogative to create substantive law by adding remedies not otherwise provided by law. See NASCO, --- U.S. at ----, 111 S.Ct. at 2137 (stating that "the imposition of sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation."); id. --- U.S. at ---- n. 16, 111 S.Ct. at 2138 n. 16 (noting the possibility that the court cannot enter the realm of substantive law in imposing sanctions). Indeed, the Supreme Court has explicitly cautioned against such substantive augmentation of the statutory scheme when applying the Miller Act. See F.D. Rich Co., 417 U.S. at 130-31, 94 S.Ct. at 2165-66. In this case, the district court determined that Blinderman had attempted, through this litigation, to pass off on Treat the financial onus of Blinderman's own mistakes through the imposition of groundless back charges and unrealistic estimates for incomplete work. The district court specifically found these efforts to constitute bad faith. We believe these determinations are sufficiently specific to require that we leave undisturbed the determination of our colleague in the district court that the circumstances before it warranted the imposition of attorneys' fees.
 
 E. Prejudgment Interest
 
 35
 In its final argument on appeal, Blinderman contends that the district court erred when it awarded Treat prejudgment interest on the amount the court found that Blinderman contractually owed Treat. In this case, prejudgment interest is governed by the law of the state of Illinois.[9] The Illinois Interest Act governs the award of prejudgment interest absent an agreement between the parties otherwise. The statute states that
 
 
 36
 [c]reditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance [;] on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment.
 
 
 37
 Ill.Ann.Stat. ch. 17, para. 6402 (Smith-Hurd 1981).
 
 
 38
 The district court held that "[i]t is also clear from the evidence and the court's findings that Blinderman withheld Treat's money in an unreasonable and vexatious way and acted in bad faith in the positions it took about settlement of the account." Mem. Op. at 12. Because the court believed that Blinderman had engaged in unreasonable and vexatious delay of payment, it awarded Treat prejudgment interest. Blinderman, however, claims that, in order to award prejudgment interest under the statute, a court must first find that the damages are liquidated or subject to exact computation. Thus, Blinderman argues that the district court erred when it held that Treat was to receive prejudgment interest on the amount due under the contract.
 
 
 39
 "Under Illinois law, the decision to award or deny prejudgment interest as an element of recoverable damages is committed to the discretion of the trial judge." Ross-Berger Cos. v. Equitable Life Assurance Soc'y, 872 F.2d 1331, 1339 (7th Cir.1989). Thus, we employ an abuse of discretion standard to review a district court's decision to award prejudgment interest. Id.; see also Marvel Eng'g Co. v. Commercial Union Ins. Co., 118 Ill.App.3d 844, 74 Ill.Dec. 272, 279-80, 455 N.E.2d 545, 552-53 (1983) (stating that a court should take the totality of the circumstances into account when determining whether a defendant has engaged in unreasonable and vexatious delay and this decision should not be disturbed absent abuse of discretion).
 
 
 40
 Under the Illinois interest statute, there are four distinct instances in which prejudgment interest is allowed absent the parties' agreement:
 
 
 41
 (1) on money lent or advanced for the use of another; (2) on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; (3) on money received to the use of another and retained without the owner's knowledge; and (4) on money withheld by an unreasonable and vexatious delay of payment.
 
 
 42
 LaBarbera v. LaBarbera, 116 Ill.App.3d 959, 72 Ill.Dec. 431, 437, 452 N.E.2d 684, 690 (1983). As noted by Illinois courts, prejudgment interest is not conditioned solely upon whether the amount of money disputed is liquidated or is easily calculated. "Interest can be awarded on money payable under building contracts, even when the amount payable may be uncertain until legally resolved" if payment was withheld by unreasonable and vexatious delays. General Dynamics Corp. v. Zion State Bank & Trust Co., 86 Ill.2d 135, 56 Ill.Dec. 51, 53-54, 427 N.E.2d 131, 133-34 (1981). Courts have emphasized that awards of prejudgment interest are necessary in order to give winning plaintiffs full compensation for their damages. Zayre Corp. v. S.M. & R. Co., 882 F.2d 1145, 1157 (7th Cir.1989). Thus, where a defendant has engaged in bad faith delaying tactics or has otherwise vexatiously delayed payment, the plaintiff should receive interest on the money to which it was rightfully entitled.
 
 
 43
 Neither an honest dispute regarding the existence of a legal obligation nor the good faith defense of a lawsuit can be deemed as unreasonable and vexatious delays of payment. Arthur Pierson & Co. v. Provimi Veal Corp., 887 F.2d 837, 840 (7th Cir.1989); Frank Novak & Sons, Inc. v. Sommer & Maca Indus., Inc., 182 Ill.App.3d 781, 131 Ill.Dec. 325, 331, 538 N.E.2d 700, 706 (1989). However, conduct tantamount to fraud, hindrances to payment collection, or other bad faith inducements designed to delay collection, are considered to be unreasonable delays. Arthur Pierson, 887 F.2d at 840; G.M. Sloan Mosaic & Tile Co. v. Newman/Lustig & Assocs., 199 Ill.App.3d 518, 145 Ill.Dec. 633, 637, 557 N.E.2d 403, 407 (1990); Frank Novak & Sons, 131 Ill.Dec. at 332, 538 N.E.2d at 707. The district court here found that Blinderman knew that it had not satisfied its obligations to Treat, but yet attempted to charge Treat with inflated back charges and brought a counterclaim in an attempt to recoup an amount of money that had already been awarded to Treat in the arbitration. The district court further found that Blinderman was attempting to pass off some of its losses on the construction project through its dealings with Treat. Accordingly, after reviewing the record on appeal, we do not believe that the district court abused its discretion when it awarded prejudgment interest to Treat.
 
 Conclusion
 
 44
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 45
 AFFIRMED.
 
 
 
 [1]
 The arbitrator set forth the terms of the award as follows:
 
 
 [1]
 TREAT BROTHERS COMPANY is required to perform fireproofing for the original contract price of $507,500.00 as set forth in the contract dated November 7, 1983
 
 
 [2]
 TREAT BROTHERS COMPANY is entitled to be paid an additional $21,500.00 by BLINDERMAN CONSTRUCTION COMPANY on its counterclaim for lathing and brown coat work
 
 
 [3]
 The administrative fees and expenses of the American Arbitration Association are to be borne equally by each of the parties and paid as directed by the Association
 
 
 [4]
 This Award is in full settlement of all claims submitted to this Arbitration
 R.18 at Ex. A. The award was signed and dated July 8, 1986.
 
 
 [2]
 Additionally, neither party suggests that the claims tried before the district court should have been referred to the arbitrator by that court. Neither party made a demand for arbitration of these claims under the arbitration clause of their contract. Instead, they chose to litigate these issues, thus waiving any right to arbitration they may have had under the terms of their contract. See St. Mary's Medical Ctr. v. Disco Aluminum Prods. Co., 969 F.2d 585 (7th Cir.1992)
 
 
 [3]
 As previously noted, the demand for arbitration states that the question presented for resolution was whether Treat was required under its original contract with Blinderman to provide fireproofing services. Demand for Arbitration, Defs.' Ex. 21
 
 
 [4]
 During construction, Blinderman and Treat could not agree on an appropriate price for these changes. Adhering to the terms of its contract, Treat completed the requested work and payment was to be determined at a later time. Unfortunately, the parties could never agree on the value of the work performed; subsequently, Treat was never paid for these tasks
 
 
 [5]
 Blinderman makes much of the fact that Mr. Treat sent invoices to Blinderman stating that the price of the work performed on Change Order AD was $7,499, while Mr. Treat now claims that the work was actually worth $17,342. Blinderman believes that this apparent contradiction negates any credibility that Mr. Treat may have evinced at trial. Mr. Treat, however, testified that the $7,499 price that Treat had previously quoted on Change Order AD was an offer of compromise on the disputed value of the change. Tr. at 99-100. Mr. Treat stated that relations on the job site had grown so strained between Blinderman and Treat that he decided to discount the price of the work on Change Order AD in the hope that Blinderman would also pay Treat for the rest of the money it was owed on its contract. Tr. at 100. The district court was entitled to credit this testimony. We see no reason to disturb the court's findings regarding the credibility of Blinderman's witnesses
 
 
 [6]
 Rule 701 states:
 If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
 
 
 [7]
 Rule 702 states:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 [8]
 See Simplex, 847 F.2d at 1293 (noting that while two of defendant's witnesses had not been disclosed as experts and could not testify as experts, they were allowed to testify as lay witnesses and relate testimony about project specifications with which they were familiar and also give opinions regarding contract specifications); Jenkins v. Whittaker Corp., 785 F.2d 720, 728 (9th Cir.) (stating that an expert need not be identified as such if he was "a viewer or actor with respect to the disputed question" and is testifying using that knowledge), cert. denied, 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 296 (1986)
 In Patel v. Gayes, 984 F.2d 214, 221 (7th Cir.1993), we held that the plaintiff's two treating physicians were correctly excluded from giving testimony regarding the applicable general medical standard of care that allegedly should have been used in treatment of the plaintiff. The excluded testimony was based on knowledge that was gained outside the doctors' treatment of the plaintiff; their testimony did not derive from their personal experience with the plaintiff and thus was expert testimony. Because the plaintiff had not identified the doctors as expert witnesses as required under Federal Rule of Civil Procedure 26(b)(4), the district court correctly excluded their testimony. Patel is distinguishable from this case, however, because here Major Ayers' testimony was based upon knowledge that he gained in his daily contact with Blinderman, Treat, and the rest of the construction project; his testimony was not based upon general propositions learned outside his personal experiences with the parties.
 
 
 [9]
 The Miller Act does not provide explicit standards for an award of prejudgment interest, thus the Act is treated as incorporating pertinent state law on this issue. See United States v. American Mfrs. Mut. Casualty Co., 901 F.2d 370, 372-73 (4th Cir.), cert. denied, 498 U.S. 851, 111 S.Ct. 143, 112 L.Ed.2d 109 (1990)