**SETHNESS–GREENLEAF, INC.,**
Plaintiff–Appellee,

v.

**GREEN RIVER CORPORATION and
Daniel J. Meyers, Defendants–
Appellants.**

No. 94–3566.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1995.

Decided Aug. 21, 1995.

Walter J. O'Brien, II, Molly B. Murphy (argued), O'Brien & Associates, Oakbrook Terrace, IL, for plaintiff-appellee.

William B. Kohn (argued), Chicago, IL, for defendants-appellants.

Walter J. O'Brien, II, Molly B. Murphy, O'Brien & Associates, Oakbrook Terrace, IL, for defendant-appellee.

Before EASTERBROOK and KANNE, Circuit Judges, and SHARP, District Judge.*

EASTERBROOK, Circuit Judge.

Green River Soda has been around since 1919. Daniel J. Meyers and Cornell Wing

thought that the brand's nostalgic appeal had not been fully exploited by its owner, Sethness–Greenleaf, and in 1985 the two entrepreneurs resolved to make a go of it themselves. Sethness–Greenleaf was willing to sell the trademarks, secret formulas and other assets of the business for $75,000. Meyers and Wing thought this a fair price but wanted Sethness–Greenleaf to finance the deal. Eventually the parties agreed that Meyers and Wing's company, the Green River Corporation ("GRC"), would pay the purchase price over time. Sethness–Greenleaf would continue to manufacture Green River concentrate, which GRC would purchase. With every gallon of concentrate paid for, GRC would receive a credit (starting at $3 and rising to $5) toward the $75,000 purchase price. Until the purchase price had been paid in full, the trademarks and secret formulas would remain in escrow as security for GRC's obligations. The deal closed in June 1985. By July 1986 GRC had fallen behind on its obligations, and in June 1988 it agreed to "pay" the outstanding balances with still more credit from Sethness–Greenleaf. It signed notes for roughly $26,000. That proved to be a temporary fix. GRC's debt continued to rise, the opposite of the original plan. With every shipment of concentrate, GRC received an invoice indicating that payment was due within 10 days of receipt ("Net 10", as the invoices put it), but GRC routinely ignored the deadline. Over the next 14 months the outstanding balance climbed to more than $60,000, and most of the original $75,000 remained unpaid. On August 3, 1989, Sethness–Greenleaf told GRC that it wanted cash, not more promises, and it demanded full payment within 30 days. Failure to meet this demand, it warned, would be a default under the parties' escrow agreement, entitling Sethness–Greenleaf to retake possession of the trademarks and secret formulas. GRC did not pay, and this suit followed.

GRC admits that it owes roughly $60,000 for product received but disputes Sethness–Greenleaf's right to retake the escrow items. On GRC's view, there was never a default under the escrow agreement because Seth-

* Hon. Allen Sharp, Chief Judge of the Northern District of Indiana, sitting by designation.

ness–Greenleaf had no right to demand payment at the time it did. Subsequent tenders of payment were spurned, it continues, and so it can't be blamed for the long delay in satisfying the debt. (GRC offered to pay in November 1989 on the condition that Sethness–Greenleaf drop this suit. Sethness–Greenleaf thought the offer too little, too late and pressed ahead with its efforts to retake the escrow items). Additional complications arose when GRC decided to exercise a little self-help. Unable to obtain additional concentrate from Sethness–Greenleaf on terms it could accept, GRC proceeded to distribute its own version of the soft drink, reasoning that because it was the rightful owner of the trademarks it could attach the Green River label to whatever it wanted. Customers noticed the difference, and when Sethness–Greenleaf got wind of the change it requested a preliminary injunction to halt the substitution. We held that Sethness–Greenleaf was entitled to this relief and urged the district court to put the remainder of the case on the fast track to decision. The only liability issue remaining, we noted, was "whether the parties orally agreed ... to allow [GRC] to delay payment as long as it did." *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 363 (7th Cir.1993). More than a year passed. Eventually the district judge concluded that this issue could be resolved on summary judgment. No oral credit agreement existed, it held, so Sethness–Greenleaf could demand payment of the outstanding balance whenever it wanted. GRC's failure to meet that demand was an event of default, entitling Sethness–Greenleaf to reclaim rights to the soft drink. 1993 WL 475498, 1993 U.S.Dist. Lexis 16226. GRC was enjoined from selling imitation Green River products. See 1994 WL 67830, 1994 U.S.Dist. Lexis 1790. Judgment on the contract claim was entered under Rule 54(b), see 1994 WL 496764, 1994 U.S.Dist. Lexis 12770, and this appeal followed. (Calculation of the damages owed to Sethness–Greenleaf under the Lanham Act remains at issue before the district court.)

■ GRC offers two objections to the district court's decision. First, it asserts that it never agreed to the payment terms in the invoices. The account was in arrears for 14 months, it points out, so how could it have agreed to pay each bill in 10 days? The answer to that question can be found in § 2–207 of the Uniform Commercial Code, 810 ILCS 5/2–207. Merchants do not negotiate the details of every transaction. They prefer instead to exchange forms containing the standard terms on which they conduct business. This can save time and effort for everyone, and the UCC facilitates the practice. A "written confirmation" from the seller operates as an acceptance even though it contains terms not found in the buyer's offer. If both parties are "merchants," moreover, the new terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

UCC § 2–207(2). GRC acknowledges in its brief that both parties to this dispute are "merchants" within the meaning of the Code, see UCC § 2–104, thus bringing § 2–207(2) into play. GRC ordered concentrate without specifying a time for payment. The terms supplied by Sethness–Greenleaf's invoices were not so surprising as to "materially alter" the parties' arrangement. Indeed, the default terms of the UCC are even less generous, making payment due on delivery. See § 2–310(a). And GRC accepted the invoices without a peep. It is too late to complain now. See UCC § 2–207 comment 5; *Schulze and Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709 (7th Cir.1987) (Illinois law); *Extel Corp. v. Cermetek Microelectronics, Inc.*, 183 Ill.App.3d 688, 692–93, 132 Ill.Dec. 10, 13, 539 N.E.2d 320, 323 (1st Dist.1989).

■ GRC's second argument is that, notwithstanding the invoices, the parties agreed to extended payment terms. Exhibit A for this defense is Meyers' affidavit. According to the affidavit, Sethness–Greenleaf's President promised to extend credit "as long as Green River sales continued to grow" and assured GRC that it would not have to pay until it turned a profit. Meyers retracted

these assertions at his deposition, however, and eventually confessed that the parties had never really discussed the subject. No doubt Meyers genuinely wanted a commitment from Sethness–Greenleaf to extend long-term credit. Perhaps he even expected it. But he could not simply assume that Sethness–Greenleaf shared his views on the subject. Contractual obligations are created and defined by objective signals the parties exchange. *Pratt Central Park Limited Partnership v. Dames & Moore, Inc.,* 60 F.3d 350, 355 (7th Cir. July 19, 1995), (Illinois law); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 313–14, 113 Ill.Dec. 252, 256, 515 N.E.2d 61, 65 (1987). Private expectations are of no consequence, *Extel Corp.,* 183 Ill.App.3d at 692, 132 Ill. Dec. at 12–13, 539 N.E.2d at 322–23; *Cohen v. Washington Manufacturing Co.,* 80 Ill. App.3d 1, 4, 35 Ill.Dec. 252, 253, 398 N.E.2d 1202, 1203 (1st Dist.1979), and because his own desires are all that Meyers' testimony contained, the district judge properly disregarded it. See also *AM International, Inc. v. Graphic Management Associates, Inc.,* 44 F.3d 572, 575–76 (7th Cir.1995).

■ As a fallback, GRC maintains that an obligation to extend credit can be discerned from the pattern of transactions between the parties. As GRC points out, a "course of dealing" or "course of performance" can be used to flesh out an ambiguous or incomplete agreement. See UCC § 2–208(1); *Frank Novak & Sons, Inc. v. Sommer & Maca Industries, Inc.,* 182 Ill. App.3d 781, 131 Ill.Dec. 325, 328, 538 N.E.2d 700 (1st Dist.1989); *Carrico v. Delp,* 141 Ill.App.3d 684, 688–89, 95 Ill.Dec. 880, 490 N.E.2d 972, 975 (4th Dist.1986). But we are at a loss to see how the parties' course of dealing is of any help to GRC. Documents exchanged by the parties establish the terms of their agreement. See *First City Securities, Inc. v. Shaltiel,* 44 F.3d 529, 532 (7th Cir.1995). This leads us back to the invoices. GRC received more than 200 of them, and it does not plead ignorance of their contents. Silent acceptance of these invoices completed the contract on their terms. See *Capitol Converting Equipment, Inc. v. LEP Transport, Inc.,* 965 F.2d 391, 395–96 (7th Cir.1992) (Illinois law); *Union Carbide Corp. v. Oscar Mayer Foods Corp.,* 947 F.2d 1333, 1336 (7th Cir.1991) (same). GRC's initial reaction to the August 1989 demand for payment supplies an additional clue. GRC first quibbled with the calculation of the amount due and then claimed that the failure to pay for product could not by itself be a default under the escrow agreement. Not until the litigation was well underway did GRC suggest that there was some sort of long-term credit agreement between the parties. See 1992 WL 188422 1992 U.S.Dist. Lexis 11165 (tracing the evolution of GRC's position).

■ More generally, a vendor who cuts the buyer some slack—even 14 months worth of slack—does not thereby "agree" to forbear indefinitely. The buyer may enjoy the extra breathing room, but when the vendor's patience runs out the buyer must pay up or face the consequences. See *In re Elcona Homes Corp.,* 863 F.2d 483, 487 (7th Cir. 1988); *Ryder v. Bank of Hickory Hills,* 146 Ill.2d 98, 165 Ill.Dec. 650, 585 N.E.2d 46 (1991); *Washburn v. Union National Bank & Trust Co.,* 151 Ill.App.3d 21, 25, 104 Ill. Dec. 242, 245, 502 N.E.2d 739, 742 (3d Dist. 1986). Were it otherwise, vendors would be inclined to cut off supplies at the first sign of trouble, and buyers as a whole would lose the benefits of lenience.

■ To be sure, forgiving vendors may have waived particular defaults, see UCC § 2–208(3); *Vogel v. Dawdy,* 107 Ill.2d 68, 76, 89 Ill.Dec. 836, 840, 481 N.E.2d 679, 683 (1985); *Wagner Excello Foods, Inc. v. Fearn International, Inc.,* 235 Ill.App.3d 224, 231–34, 176 Ill.Dec. 258, 263–65, 601 N.E.2d 956, 961–63 (1st Dist.1992); and may be required to give notice before adopting a hard line for the future, see *Lang v. Parks,* 19 Ill.2d 223, 226, 166 N.E.2d 10, 12 (1960); *Steven W. Barrick & Associates v. Witz,* 147 Ill.App.3d 615, 620, 101 Ill.Dec. 414, 418, 498 N.E.2d 738, 742 (2d Dist.1986); *Miles Homes, Inc. v. Mintjal,* 17 Ill.App.3d 642, 646–47, 307 N.E.2d 724, 728 (4th Dist.1974). But waiver in contract law is the intentional relinquishment of a known right, *Cole Taylor Bank v. Truck Insurance Exchange,* 51 F.3d 736 (7th Cir.1995) (Illinois law); *Ryder,* 146 Ill.2d at 104, 165 Ill.Dec. at 653, 585 N.E.2d at 49, and

nothing in Sethness–Greenleaf's conduct suggests that it ever abandoned its right to payment. Even if it initially lulled GRC into complacency, moreover, Sethness–Greenleaf refrained from acting until GRC had notice that delay would not be tolerated, and it gave GRC a further 30 days to pay. Under section 6(b) of the escrow agreement GRC was entitled to written notice of any past due obligations plus an additional 30 days in which to cure the default. That's exactly what it got, and if it wanted a longer grace period it should have bargained for it up front. Having failed to do so, it is in no position to complain about the timing of Sethness–Greenleaf's demand. Cf. *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1356–57 (7th Cir.1990).

AFFIRMED.